C. M. BRADFORD et al.,
Plaintiffs-Appellees,

v.

PLAINS COTTON COOPERATIVE AS-
SOCIATION, Defendant-Appellant.

Nos. 75–1217–75–1225.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 29, 1976.

Decided July 9, 1976.

Rehearing Denied Aug. 11, 1976.

Burck Bailey, Oklahoma City, Okl. (Fellers, Snider, Baggett, Blankenship & Bailey, Oklahoma City, Okl., and William W. Blackledge, Lubbock, Tex., on the brief), for appellant.

Bob R. Scarbrough, Altus, Okl. (Harbison & Weber, Altus, Okl., on the brief), for appellee in No. 75–1217.

Tal Oden, Altus, Okl. (Oden & Oden, Altus, Okl., on the brief), for appellees in No. 75–1218.

Paul Stumbaugh, Mangum, Okl., for appellees in Nos. 75–1219, 75–1220, 75–1221, 75–1222, and 75–1225.

William M. Fancher, Hollis, Okl. (Fancher & Moore, Hollis, Okl., on the brief), for appellees in No. 75–1223.

Larry Weber, Altus, Okl. (Harbison & Weber and Bob R. Scarbrough, Altus, Okl., on the brief), for appellee in No. 75–1224.

Neil P. Gillen, Washington, D.C. (Walter H. E. Jaeger, Chicago, Ill., on the brief), filed a brief on behalf of the American Cotton Shipper Ass'n as amicus curiae urging reversal.

Before LEWIS, Chief Judge, BREITENSTEIN and BARRETT, Circuit Judges.

BREITENSTEIN, Circuit Judge.

The issue in these diversity jurisdiction cases is the validity of forward contracts for the sale by the plaintiffs-appellees of cotton to the defendant-appellant. The district court gave the plaintiffs judgments against the buyer totaling over $521,000, plus interest, for cotton sold by them and a total of $19,000 for attorneys' fees. The buyer appeals. We reverse.

The plaintiffs-appellees are all farmers who raise cotton in Oklahoma. Defendant-appellant Plains Cotton Cooperative Association is a cotton marketing cooperative owned by some 20,000 farmers in Texas and Oklahoma. Its principal office is in Lubbock, Texas. In early 1973 the growers made forward contracts with the buyer covering the crop to be grown that year. After the execution of the contracts, the market price of cotton increased substantially. In the Fall of 1973 nine suits were either filed in, or removed to, the United States District Court for the Western District of Oklahoma. Seven of these were brought by individuals; one jointly by eight growers; and one jointly by four growers. The buyer, Plains, was the defendant in each suit.

The suits sought to invalidate contracts for the sale of the 1973 cotton crop to Plains. The parties stipulated that the growers would deliver to Plains all of the cotton "alleged to be contracted" to Plains and, if at delivery, the market price exceeded the contract price, Plains would pay the difference into court for the benefit of the prevailing party. The cases were consolidated for trial to the court. After making extensive findings, the court held that the contracts were invalid for a variety of reasons. The delivery price was greater than the contract price. The court entered nineteen individual judgments, ranging from $6,200 to $65,000, plus interest, and attorneys' fees, against Plains. The cases have been consolidated for purposes of review.

I.

A forward contract, as the term is used in these cases, is a contract between a grower and a buyer whereby the grower agrees to sell cotton grown on designated acreage during a certain crop year for delivery after harvesting. Forward contracts "have become common in the American cotton marketing system." *Allenberg Cotton Co. v. Pittman*, 419 U.S. 20, 26, 95 S.Ct. 260, 264, 42 L.Ed.2d 195. They protect a grower against a price decline, Ibid. When the price rises, "the forward contract becomes relatively unprofitable" and the grower may have "an economic incentive * * * to breach his contract and sell the cotton elsewhere." Ibid. at n. 8. The buyer may protect himself by selling cotton "in quantities approximating the expected yield" under his purchase contracts. Ibid. Alternatively, he may protect himself "by 'hedging,' *i. e.,* offsetting his purchases with a sale of futures contracts on the cotton exchange." Ibid. at 26–27, 95 S.Ct. at 264. "The stability of the position * * * [of the buyer] clearly depends on the integrity and enforceability of his contracts for purchase and resale." Ibid. 419 U.S. at 27, 95 S.Ct. at 264 (footnote omitted).

Sixteen of the plaintiffs-growers signed contracts in March or April, 1973, two in May, and one in July. The prices were stated in points above government loan and ranged from 9.25 cents per pound for five growers, 11.5 cents for thirteen growers, to 24 cents for one grower. Concurrently with the confirmation of the purchases Plains sold 75% of the anticipated yield and hedged the remainder.

In the late Spring and in the Summer of 1973, the price of cotton increased substantially. The growers sued to invalidate their contracts. In addition to the suits at bar, the following suits were brought, all of which held that forward contracts for the 1973 crop were valid and enforceable. *Riegel Fiber Corp. v. Anderson Gin Co.*, 5 Cir., 512 F.2d 784; *Hohenberg Bros. Co. v. Killebrew*, 5 Cir., 505 F.2d 643; *Taunton v. Allenberg Cotton Co.*, M.D.Ga., 378 F.Supp. 34; *Mitchell-Huntley Cotton Co., Inc. v. Waldrep*, N.D.Ala., 377 F.Supp. 1215; *Cone Mills Corp. v. Hurdle*, N.D.Miss., 369 F.Supp. 426; *Kimsey Cotton Co., Inc. v. Ferguson*, Ga., 233 Ga. 962, 214 S.E.2d 360;

and *Harris v. Hine*, 232 Ga. 183, 205 S.E.2d 847.

No one acting for Plains solicited any grower to sell his cotton to Plains or induced him to do so. Plains furnished its contract forms and price schedules to local gins. Typically, a grower would go to a gin and ask what Plains was paying for cotton. The gin employee would quote the top price on the pertinent schedule. Although frequently the growers did not examine them, the Plains schedules were available at the gins. They provided for less than top price for inferior grades of cotton. If the grower decided to sell to Plains, a gin employee would obtain the information necessary to fill out the contract forms. The price schedule would be identified by number only. The employee would then place a telephone call to Plains at its home office in Lubbock, Texas, report the information, and inquire whether Plains would confirm the transaction. Upon Plains confirmation, the contract, executed in triplicate by the grower, would be sent to Plains. Plains would attach the pertinent schedule, execute the contract, and return to the gin a copy for the grower.

The contracts first described the cotton sold by identification of the farm and the producer, the crop year, and the total acres of farm under cultivation. Following this was a box and the words "All Cotton Produced on the Farm, OR" a specified interest therein. In the typical contract a check mark was placed in the box.

The next section of the contract contained planting information, the total farm acres of cotton, the projected yield, and other information not here pertinent. The places where the cotton was to be ginned and stored were specified.

In blanks under the heading "AGREED MARKET PRICE ADVANCE" there was written in "See schedule (followed by a number which varied from contract to contract) attached." After this was a provision that "Cotton Delivered to Compress After (a date which varied) may be Excluded from this Contract at the Option of the Association."

The contract then contained a section on "Lienholders" followed by a "Marketing Agreement" not here pertinent and under the heading "SALE AND CONVEYANCE" referred to the terms and conditions appearing on the back of the contract form and provided that the contract should be applicable to all cotton produced on the designated farm during the crop year.

At the bottom of the front page were blanks for insertion of the execution date and for the signatures of the parties. On the back of the contract were a number of printed provisions, none of which are material to the issues now under consideration.

After stating that the gin managers were the agents of Plains and that there was unreasonable delay in the delivery of a copy of the executed contract to the grower, the trial court held that no contract was made because (1) there was no meeting of the minds, and (2) Plains materially altered the contracts. The court went on to hold that the contracts were void because they were obtained by fraud and were unconscionable.

## II.

Plains attacks the holding that the gin managers were its agents. The growers came to their local gin voluntarily and without solicitation. If they wished to sell to Plains a gin employee took the necessary information, filled in the blanks, and called the Lubbock office. Without any inducement by a gin employee, the grower signed three copies and the gin sent them to Plains. In the circumstances a determination of whether the gin, or any of its employees, were agents of either Plains, or of the grower, or a common agent of both, is unnecessary.

After receipt of the contracts from the gins, Plains attached the schedule pertaining to the number appearing on the form signed by the grower. These schedules contained specific provisions relating price to quality. In some cases Plains changed the exclusion date, i. e., the date after which Plains had the option to reject the cotton. An officer of Plains executed the contract

on its behalf and an executed copy for the grower was sent to the gin. The gin either delivered the contract to the grower, held it for him to pick up, or mailed it to him. The time which elapsed from the execution by the grower to the delivery of the completed contract to the grower varied from transaction to transaction. No grower is shown to have suffered any detriment by the delay. Although Plains claims that the growers were estopped from rejecting the contracts because they waited until after Plains had acted thereon and also claims that the suits are barred by the laches of the growers, we find it unnecessary to determine these issues. The delay in contract receipt by the grower does not affect the validity of the contracts and merits no consideration.

### III.

■ The validity of the contracts must be tested by Oklahoma law. The court relied on, and erroneously cited, an old Oklahoma statute, 15 O.S. § 66, which appears in Okl.R.L.1910 § 911, and which provides that: "Consent is not mutual unless the parties all agree upon the same thing in the same sense." In 1961 Oklahoma adopted the Uniform Commercial Code, 12A O.S. § 1–101 et seq. The Code rejects the subjective test of intent to contract and replaces it with mutuality of assent as manifested by the conduct of the parties.

■ A contract for the sale of growing crops is a contract for the sale of goods within the provisions of the Code. Section 2–107(2). Code § 2–204(1) provides that: "A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."

We are not impressed with the argument of the growers that under Code § 1–103 existing law, and particularly § 66, is retained with full vitality. Section 1–103 says that certain principles of contract law apply unless displaced by particular provisions of the Code. The mutual consent requirement of § 66 has been replaced by the Code provisions relating to mutuality of

assent as shown by conduct. § 2–204(1) supra.

■ The execution of a contract by a grower was an offer to sell on the terms stated. The attachment by Plains of the price schedule with price related to quality, and the change in the exclusion date was an acceptance by Plains of the offer on additional terms. Code § 2–207(2) says that "The additional terms are to be construed as proposals for addition to the contract." Thus, the additional terms do not invalidate the contract. The non-acceptance by the growers of the additional terms becomes of importance only if (1) a grower received less than the top price for his cotton or (2) a grower is adversely affected by the change in the exclusion date. Plains contends the 95% of the cotton which it purchased went at the top price and that no one was hurt by the change in the exclusion date. We do not know whether the Plains position is right or not. The court made no findings with regard thereto and we will not make the requisite findings in the first instance.

■ The record shows that if the price had gone down, the growers would have held Plains obligated to buy their cotton. The conduct of the parties establishes mutuality of assent to the contracts. The changes made by Plains were not alterations of the contracts but the imposition of additional terms. Because the growers did not agree to the additional terms, they may recover whatever loss, if any, they have suffered by the application of such terms.

In the contracts the description of the cotton sold read:

"This Contract Covers all Cotton of the undersigned Producer or Producers now growing or to be grown during the 1973–1974 Crop Year, on the Designated Farm as described in the County ASCS records, * * *."

Below the foregoing, the contract contained "Planting Information." In pertinent blanks were inserted the total acres of cotton on the farm, the projected yield and other pertinent information. Plains recog-

nized the difficulty in estimating the number of acres which would be actually planted in cotton and allowed a 10% tolerance. The effect was that the farmer would receive the contract price on 110% of the stated cotton acreage.

■ At the time of the execution of the contracts, the government limited the number of acres in each farm for which the farmer would receive the government production payment. In the Spring of 1973 the government removed the acreage limitation and some farmers "over planted" in excess of the contract acreage figure.

The growers urge, and the court held, that the contracts are ambiguous and void because they first cover "all" cotton produced on the farm and then state an acreage limitation. The growers say that on cotton produced from the "over plant" they are entitled to the market price at delivery rather than the contract price.

The government's lifting of the acreage restriction was not, and could not have been, foreseen and was not within the contemplation of the parties at the time of contract execution. The action of the government did not void the contracts. At the most it presents the question of the price to be paid for the cotton produced on the "over plant."

On May 4, 1973, Plains wrote its contract holders that:

"All cotton produced on a farm under contract to PCCA must be delivered to the Marketing Association. Under no circumstances, may cotton be contracted or sold to someone else if produced on a farm which has been contracted to the Association."

Under the stipulations made after these suits were brought the growers agreed "to harvest and produce all cotton alleged to be contracted to the defendant." Plains says that it paid the market delivery price for all cotton produced from "over plant." The trial court made no finding in this regard. All that we can say on the record presented is that neither the removal of the acreage limitations nor the fact of "over plant" voided the contracts.

## V.

The trial court held that the failure of Plains to inform the growers of the provisions on the back side of the contract was fraud which voided the contracts. The contracts contained the following provision which appeared just above the signature lines:

"The terms and conditions hereon and those printed on the back of this Crop Contract, constituting this sale and conveyance, have been read and assented to by each of the parties."

■ Plains did not deny any farmer an opportunity to read the back side and did not make any representations as to its contents. The failure of the farmers to read the back side is of no consequence. In a suit involving Oklahoma law, *Jordan v. Hall-Miller Drilling Co.*, 10 Cir., 203 F.2d 443, 446, we said:

"One in possession of his faculties, being able to read, and having the opportunity to read an instrument which he signs will not be relieved therefrom merely because he did not in fact read the contract." (Footnote omitted)

The court made no findings of, and the record does not show, any false representation knowingly made with intent to deceive resulting in reliance and injury. The written statements of the court with reference to fraud are in contrast to the statements of the court at the conclusion of the trial. The court then said:

" * * * this defendant company, they are all honorable people, very honorable. At no time did anyone ever act in bad faith."

And again:

"But this Court finds that no one, just no one, has been dishonest. There is no fraud. I do not say that there is any fraud here at all."

We agree with the quoted oral statements. The claim of fraud is utterly without merit.

## VI.

The trial court held that the contracts were unconscionable and hence void. In so doing it found that the forward contracts made at or before planting time provided for payment at a price less than half of the market value of the cotton at delivery time. The increase in price has nothing to do with unconscionability. The test is the character of the contract at the time of making. See Code § 2–302. The Uniform Commercial Code Comment following this section in the Oklahoma statutes says in part:

"The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable *under the circumstances existing at the time of the making of the contract.*" (Emphasis supplied.)

Nothing in the record shows that the contract prices were unfair or unconscionable at the time of contract execution. The increase in cotton prices was unexpected and unforeseeable.

The record does not show an unawareness by any grower of the market price at the time of the execution of the forward contracts or that any grower at that time thought that he was receiving an unfair price. The subsequent price increase did not make the contracts unconscionable at the time of making. The rise in price was a fortuitous circumstance beyond the control of any party.

To sustain its holding of unconscionability, the court found that Plains made "tremendous profits" on the 1973 crop. The record shows that Plains had a total gain for that period of $1,063,000 on the movement of $120,000,000 worth of cotton. A gain of less than nine-tenths of a percent is not a tremendous profit. In any event the fact of a profit or loss by Plains has no relevance to the validity of the contracts. At the trial, counsel for the growers were willing to so stipulate.

The court further found that the contracts were unconscionable for want of equality in bargaining power. The trial court found that the Plains' officers were experts in cotton trends and the growers were ignorant. Nothing in the record shows that Plains knew that the price would rise. Its actions belie the charge. Plains made periodic estimates of the amount of cotton covered by its purchase contracts and currently "would sell 75% of what we thought we would get and hedge the other 25%." A witness for Plains testified that the reason for the hedge was because it was not "prudent to sell to textile mills a hundred percent of the expected production because the quantity and the quality may not be what we would have projected." He explained "hedge" as a "device, well known in agricultural commodity training [trading], of hedging a portion of our purchases of acreage by making offsetting sales of futures contracts." The immediate sale by Plains of 75% of the cotton purchased under the forward contracts dispels any inference that the expertise of Plains enabled it to foresee the future price increase. If it could have foreseen the increase, it would have held the cotton rather than selling. Plains did not speculate with the cotton which it purchased.

Cotton prices may be affected by a myriad of factors running the gamut from growing conditions, fashion trends, and governmental action to foreign policy. By signing the contracts, the growers offered to sell to Plains. There is no contention that the price was below the then market. There is no proof that Plains solicited the contracts or induced any farmer to contract. Plains accepted the offers and concurrently sold 75% of the cotton purchased. The argument that Plains overreached the farmers is contrary both to the facts shown by the record and the conditions existing in the commodity markets which the Supreme Court, quoting from a House Report, has characterized as "a very important part of our marketing system." Allenberg, 419 U.S. at 27, 95 S.Ct. at 264.

The contracts are valid and enforceable except for the additional terms and "over plant" production mentioned herein.

### VII.

 The court found that "under Oklahoma statute and under the facts in this case" the growers were entitled to recover attorneys' fees and awarded each of the nineteen plaintiffs $1,000 for attorneys' fees. To support its action, the court cited 12 O.S. § 936 which provides:

> "In any civil action to recover on an open account, * * * or contract relating to the purchase or sale of goods, wares, or merchandise, * * * unless otherwise provided by law or the contract which is the subject to [of] the action, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs."
> (Footnote omitted)

In *F. D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 126, 94 S.Ct. 2157, 2163, 40 L.Ed.2d 703 the Court said that attorneys' fees " 'are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor.' " (Citation omitted) See also *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141. The contracts before us do not provide for the recovery of attorneys' fees.

*Woods Construction Co. v. Atlas Chemical Industries, Inc.,* 10 Cir., 337 F.2d 888, 890, recognized § 936 and particularly its provision that an allowed attorney's fee "be taxed and collected 'as costs.' " The court held that noncompliance with the local federal court rule for the taxing of attorneys' fees as costs precluded recovery. The record before us does not disclose the local federal court rule or any compliance therewith.

Be that as it may, in *Sarkeys v. Haas,* Okl., 402 P.2d 894, 901, the Oklahoma Supreme Court held that under § 936 attorneys' fees could not be awarded when "the plaintiff neither submitted nor attempted to submit evidence concerning the value of his attorney's services."

The growers' briefs in this court do not attempt to sustain the award of attorneys' fees and point to no evidence of the value of the attorneys' services. The court made its awards on the basis of "its 30 years experience as a trial lawyer." The experience of the court is no substitute for the evidence which *Sarkeys v. Haas* requires. The award of attorneys' fees was improper.

In the consolidated appeals which are covered by this opinion, the judgments are severally reversed and each case is remanded to the district court for further proceedings in the light of this opinion.