**KERR–McGEE CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**NORTHERN UTILITIES, INC., a Wyoming Corporation, Defendant.**

**NORTHERN UTILITIES, INC., a Wyoming Corporation, Plaintiff,**

v.

**AMOCO PRODUCTION COMPANY, a Delaware Corporation, and Phillips Petroleum Company, a Delaware Corporation, Defendants.**

Nos. C78–006B, C78–081B.

United States District Court, D. Wyoming.

Oct. 23, 1980.

11. Exhibit B, p. 13; Exhibit C, p. 7.

William T. Schwartz, Casper, Wyo., B. J. Zimmerman, Oklahoma City, Okl., Peter J. Nickles, Washington, D.C., for plaintiff.

William H. Brown and Claude W. Martin, Casper, Wyo., for Northern Utilities.

Edwin V. Magagna and William Bryce Arendt, Casper, Wyo., John S. Pfeiffer, Denver, Colo., R. H. Landt, Denver, Colo. (in–house counsel), for Amoco.

Houston G. Williams, Casper, Wyo., Thomas M. Blume and Dale A. Mayer, Englewood, Colo. (in–house counsel), for Phillips.

Steven R. Shanahan, Asst. Atty. Gen., Cheyenne, Wyo., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIMMER, Chief Judge.

The above–entitled matter having been tried to the Court, on June 25, 26, and 27, 1980, Kerr–McGee Corporation appearing by and through William T. Schwartz, Esq., B. J. Zimmerman, Esq., and Peter J. Nickles, Esq., Northern Utilities, Inc. appearing by and through William H. Brown, Jr., Esq., Claude W. Martin, Esq., Edwin V. Magagna, Esq., and William Bryce Arendt, Esq., Amoco Production Company appearing by and through John S. Pfieffer, Esq., and R. H. Landt, Esq., Phillips Petroleum Company appearing by and through Houston G. Williams, Esq., Thomas M. Blume, Esq., and Dale A. Mayer, Esq., and the State of Wyoming, appearing amicus curiae, by and

through Steven R. Shanahan, Assistant Attorney General for the State of Wyoming, and the Court having heard the testimony submitted for and on behalf of the parties, and having reviewed the pleadings, the Agreed Statement of Facts, the evidence, the exhibits, and briefs filed for and on behalf of the parties, and being fully advised in the premises, makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. The jurisdiction of this Court is founded upon the diversity of citizenship of the parties and the requisite amount in controversy. 28 U.S.C. § 1332.

2. Northern Utilities, Inc. ("Northern"), is a corporation incorporated under the laws of the State of Wyoming, with its principal place of business in Wyoming. Northern Utilities, Inc. is the successor in interest of Northern Utilities Company.

3. Northern is an intrastate public utility, certificated by the Public Service Commission of the State of Wyoming. Northern's rates, its service, and its earnings are regulated by the Public Service Commission of Wyoming. As a public utility, Northern is permitted to earn a fair, just and reasonable rate of return on its capital investment.

4. Kerr–McGee Corporation ("Kerr–McGee"), formerly Kerr–McGee Oil Industries, Inc., is a corporation incorporated under the laws of the State of Delaware, whose principal place of business is Oklahoma City, Oklahoma.

5. Amoco Production Company ("Amoco"), is a corporation incorporated under the laws of the State of Delaware, whose principal place of business is Chicago, Illinois, and who is duly authorized to transact business in the State of Wyoming. Amoco is the successor in interest of Pan American Petroleum Corporation, which was the successor in interest of Stanolind Oil and Gas Company.

6. Phillips Petroleum Company ("Phillips"), is a corporation incorporated under the laws of the State of Delaware, whose principal place of business is Bartlesville, Oklahoma, and who is duly authorized to transact business in the State of Wyoming.

7. This case involves the interpretation of intrastate Gas Sales Contracts between (1) Amoco and Northern Utilities, dated November 20, 1957, as amended by a Supplemental Agreement, dated October 1, 1970; (2) Kerr–McGee and Northern Utilities, dated October 14, 1958, as amended by a Supplemental Agreement, dated February 23, 1973; and (3) Phillips and Northern Utilities, dated May 20, 1958, as amended by a Supplemental Agreement dated May 4, 1973.

8. Amoco, Kerr–McGee, and Phillips each own working interests in oil and gas leases in the Beaver Creek unit, Fremont County, Wyoming. The ownership interests of the parties in the various formations in the Beaver Creek Field are as follows:

Frontier-Dakota Formation

| | | |
|---|---|---|
| Amoco | – | 86.35979% |
| Kerr-McGee | – | 5.93651% |
| Phillips | – | 7.70370% |
| | | 100.00000% |

| | | |
|---|---|---|
| Madison Formation | – | Amoco 100% |
| Phosphoria Formation | – | Amoco 100% |
| Tensleep Formation | – | Amoco 100% |
| Second Cody Formation | – | Amoco 100% |
| First Cody Formation | – | Amoco 100% |

9. All of the natural gas involved in this case is produced from wells producing from the Frontier–Dakota participating area, and from wells producing from the Phosphoria formation. Such producing wells were commenced (spudded) on various dates between September 1, 1937 and October 31, 1969.

10. Northern's principal service areas are Lander, Riverton, Casper and intermediate communities in Wyoming. Northern sells part of this gas to Northern Gas Company, an intrastate public gas utility which serves Rawlins, Laramie, and intermediate communities. All of the Beaver Creek gas is sold to Northern pursuant to contracts with Amoco, Kerr–McGee and Phillips.

11. Amoco is the unit operator of the Beaver Creek Unit Area (Beaver Creek

Field) under a Cooperative Development Contract and Unit Plan dated March 29, 1932, and amendments thereto. As such operator Amoco collects and receives payments from Northern for all of the gas produced and sold from the Beaver Creek Field and distributes to Phillips and Kerr–McGee their respective shares thereof. Amoco also pays all severance taxes, production taxes, ad valorem taxes and all royalties for its account and for the account of Phillips and Kerr–McGee. Northern obtains approximately 85% of its total supply of gas from the Beaver Creek Field under the above–mentioned Gas Sales Contracts. Northern sells to the Standard Refinery in Casper (an affiliate of Amoco) and to Amoco at Salt Creek and Winkleman Dome gas volumes approximating 40% of the total annual volume purchased from Beaver Creek. Northern receives for gas delivered to said points a price per Mcf equal to the price it pays for Beaver Creek gas at the Beaver Creek Field plus a fee of 5 cents per Mcf for gas delivered to the Casper refinery, 6 cents per Mcf for gas delivered to Salt Creek and 9 cents per Mcf for gas delivered to Winkleman Dome. The obligation of Northern to sell and deliver such quantities extends to the expiration of the Supplement, December 31, 1990.

12. Northern and Amoco entered into a twenty–year Gas Sales Contract dated November 20, 1957 (herein referred to as the "1957 Amoco Contract"), in which Amoco agreed to sell and Northern agreed to buy all of Amoco's Beaver Creek gas, up to maximum quantities specified therein. Northern and Kerr–McGee entered into a Gas Sales Contract dated October 14, 1958, (the "1958 Kerr–McGee Contract"), in which Kerr–McGee agreed to sell and Northern agreed to buy all of Kerr–McGee's gas, up to the maximum quantities specified therein, allocated to or owned by Kerr–McGee from certain lands and formations in the Beaver Creek Field. Northern and Phillips entered into a Gas Sales Contract dated May 20, 1958 (the "1958 Phillips Contract") wherein Phillips agreed to sell and Northern agreed to buy all of Phillips' gas, up to the maximum quantities specified

therein, allocated to or owned by Phillips from certain lands and formations in the Beaver Creek Field, at the same price and in accordance with the other relevant terms of the 1957 Amoco Contract. All of the terms of the 1958 Kerr–McGee Contract and the 1958 Phillips Contract relevant to this lawsuit are identical to those in the 1957 Amoco Contract. Both Phillips and Kerr–McGee ratified the 1957 Amoco Contract without negotiations with Northern.

13. The 1957 Amoco Contract was amended four times prior to 1970, but these amendments did not make changes in the contract price. The first and third amendments incorporated into the contract deliveries of Sherwood Unit Gas produced in Natrona and Converse Counties, Wyoming. These amendments are no longer of concern, the Sherwood Unit Gas having been exhausted. The second amendment changed the point of delivery to the Beaver Creek Gas. The fourth amendment concerned the sale by Amoco to Northern of its wholly–owned gas from the Phosphoria formation in the Beaver Creek Field.

14. In April, 1970, pursuant to Amoco's letter, Northern and Amoco entered into negotiations which were carried on in Amoco's Denver office and which culminated in the Supplemental Agreement dated October 1, 1970 amending the 1957 Amoco Contract (herein referred to as the "Amoco Supplement" or the "Supplement") and a number of related or collateral agreements referred to elsewhere herein. On February 23, 1973, Northern and Kerr–McGee entered into a Supplemental Agreement (the "Kerr–McGee Supplement") wherein all relevant terms were identical with those in the supplement negotiated by Amoco and Northern. On May 4, 1973, Phillips and Northern entered into a Supplemental Agreement (the "Phillips Supplement") amending said 1958 Phillips Contract wherein all relevant terms were identical with those in the Supplement negotiated by Amoco and Northern.

15. Paragraph 4 in each of said supplements provides as follows:

"4. The paragraph comprising present Article 6, Favored Nations Clause, is designated (a), and the following new paragraph (b) is added to said Article 6:

"(b) From and after January 1, 1976, when the price to be paid by Northern to Pan American pursuant to the other provisions hereof is less than the sum of the price received for gas being sold in interstate commerce, by any producer within the State of Wyoming, except in the counties of Uinta and Lincoln, plus three cents per one thousand cubic feet (3¢Mcf), then Northern shall increase the price to be paid Pan American hereunder to a price equal to the price being received by such producer plus three cents per Mcf." (Said new paragraph (b) will be referred to herein as "Article 6(b)").

Clause 6(b) is not a standard clause of common use in the industry, but is a unique provision. Arles H. Barrett, of Amoco, testified that he knows of no other contract containing this clause.

16. All relevant terms and provisions in the separate contracts referred in this case between Phillips and Kerr–McGee with Northern are identical with the contracts between Amoco and Northern from which they were copied or adopted by reference. For brevity references made in these findings to the Supplement will also apply to the Phillips Supplement and the Kerr–McGee Supplement unless otherwise noted.

17. The 1957 Amoco contract is a 41 page document plus an Exhibit A, setting forth the acreage dedicated to the contract, an Exhibit B setting forth the quantities of gas to be delivered, received and paid for, and an Exhibit C, setting forth a map of the pipeline to be built by Northern from Beaver Creek to Casper. The quantity which Northern is obligated to take or pay for in any year ("take or pay" obligation) is set forth in Exhibit B and is conditioned upon the producers' ability to deliver the specified maximum quantities ("peak deliverability").

18. Article 5 of the 1957 Amoco contract sets forth a base price per Mcf of the gas to be delivered in each of the 20 years during the contract term. The price for year 1959 is 10.17 cents Mcf and each succeeding year's price is incrementally higher; the base price for year 1978 is 20.18 cents.

19. Article 7 of the 1957 Amoco Contract is entitled "Inflation–Deflation Adjustment". It provides for adjustments each year of the Article 5 base price for inflation or deflation determined by references to the Wholesale Price Index. Article 16 of the 1957 Amoco Contract provides by a reference to Article 10 of Chapter 32, WCS 1945, that ad valorem taxes will be borne by the parties against whom the tax is levied and other taxes therein specified assessed against the producers would be reimbursed by Northern to the extent of three–fourths thereof. The Supplement makes no change in Article 16 with respect to ad valorem taxes but increased from seventy–five percent to one hundred percent the amount of reimbursement for other taxes to be paid by Northern.

20. The Supplement amends the 1957 and 1958 contracts in the following respects:

(1) extends the term 12 years and two months to December 31, 1990;

(2) increases the base prices set forth in Article 5 for the period of the next ended term (the base prices for the extended term are set forth for each year providing for a base price of 21.81¢ for year 1979, incrementally higher prices for each year thereafter with a base price of 29.84¢ for year 1990) all subject to adjustment of inflation or deflation;

(3) increases the annual take or pay obligation of Northern relative to the peak deliverability obligation of producers from a ratio of 59% to a ratio of 92.7% beginning in 1970 through 1990 by incorporation of a revised Exhibit B;

(4) redesignates Article 6 of the 1957 contract as Article 6(a) and adds a new Article 6(b) which new article is at the center of the principal controversy herein;

(5) increases the minimum daily quantity that Northern is obligated to receive from 11 thousand Mcf plus deliveries at Salt Creek, to 15 thousand Mcf plus deliveries at Salt Creek and Winkleman Dome;

(6) decreases the delivery pressure obligation of Amoco from 600 psia to 580 psia;

(7) provides that if Amoco is unable to deliver Phosphoria formation gas, Northern nevertheless shall be obligated to purchase an additional quantity from other Beaver Creek formations as will make up the deficiency of Phosphoria formation gas; and

(8) increases the obligation of Northern to reimburse severance and conservation taxes from 75% to 100% but does not change Article 16 as to ad valorem taxes; and

(9) continues the provisions of the 1957 contract authorizing the producers to suspend deliveries and terminate the contracts in the event of a default by Northern.

21. The Supplement was negotiated by Amoco on the premise that there were a number of advantages to be derived from selling the excess gas to Northern. The memorandum from K. W. Beaver to Mr. Hegglund (Exhibit I–7) shows that the price from Northern would be better than in an interstate sale, the sale could be started as soon as an agreement was made with Northern, whereas an interstate sale would have required about two years of FPC negotiations. Amoco calculated that Amoco could sell over $15,000,000 of additional gas to Northern during the next eleven years if the reservoir is capable of producing the rates necessary to do this. That number would convert to 25¢ per Mcf for sixty billion cubic feet. Mr. Beaver therein noted "We need to look at the above deal with Northern in comparison to another deal whereby we would sell the sixty billion cubic feet to a second party and have a two-year delay in marketing because of the FPC requirements." In addition, he notes Amoco needed to look at the benefits that would accrue to Amoco through reduced investment if the sale were to be made to Northern as outlined and the benefit to Amoco of reduced maximum peak requirements.

22. In an early Amoco draft of the proposed Supplement (Exhibit I–8), Mr. Barrett made a note reading "Need an excess of FPC price clause", and Exhibit I–9 is a copy from another contract of a clause which he marked "guide addition". That clause specifically referred to "a just and reasonable rate for the area . . . as prescribed by Order of the Federal Power Commission . . ."

23. Mr. Barrett and Mr. Magagna discussed the addition of a clause which would permit the seller to increase the price to the just and reasonable rate for the area to be established for the Rocky Mountains by the Federal Power Commission. In Amoco's first draft of the Supplement (Exhibit I–8) no clause was contained other than clause 6(a) to provide for an indefinite future price. A clause (Exhibit I–9) was suggested by Amoco to its scrivener to add a provision for escalation equal to the FPC "just and reasonable rate for the area." This clause was not used but in a subsequent draft of the Supplement Amoco inserted in paragraph 4 (Exhibit 10) the essence of clause 6(b). Mr. Barrett testified that this clause was written by Amoco's legal counsel at his direction and that it was his intention that the clause would permit Amoco to collect the highest price received by any producer selling any gas in interstate commerce in the prescribed area without regard to any other conditions.

24. Edwin V. Magagna testified that his understanding of the purpose of clause 6(b) was to provide an alternate price to the specific contract terms in the event that the price which Amoco could have received if it sold the gas to an interstate buyer instead of to Northern in 1970 would be higher than the specific prices set forth in Article 5 adjusted by Article 7 of the 1957 Gas Sales Contract.

25. The concept of FPC area price controls (as distinguished from well head price controls) was first advanced in the Permian

Basin Area Rate Proceedings, 34 FPC 159 (1965), and the concept was approved by the Supreme Court by its decision *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

26. In 1970 and 1973 the producers were aware that the FPC was proposing new rules to regulate nationwide new sales of natural gas in interstate commerce, specifically including Wyoming. Notices of such proposed rule making and request for comments from all interested parties on rate of return and other factors and of the times and places of public hearings, dated June 17, 1970 and July 17, 1970, were published in the Federal Register. (Exhibits J and K). At that time the FPC had not yet established the boundaries for the area which would include the State of Wyoming. The parties contemplated that the State of Wyoming, with the exception of Lincoln and Uinta Counties, would be one area for FPC area prices.

27. The FPC began establishing rates for the Rocky Mountain Area by FPC Order No. 435, 46 FPC 68, which was issued July 15, 1971. This order identified six sub-areas which the FPC had determined to exist within the Rocky Mountain Area. These sub-areas included the Uinta–Green River Basin Area which including the Wyoming counties of Lincoln, Uinta, Carbon, Sweetwater and Sublette, as well as several other counties in the States of Utah and Colorado. The sub-area defined as Montana–Wyoming Area included the remaining counties in Wyoming.

28. FPC Opinion No. 658, issued April 11, 1973, modified the definition of the Uinta–Green River Basin sub-area to include the following Wyoming counties: Albany, Carbon, Sweetwater, Sublette, Lincoln and Uinta, and further provided that the Montana–Wyoming sub-area would include the remaining Wyoming counties.

29. On December 4, 1974, the Federal Power Commission issued its Opinion 699–H, effective June 21, 1974. Therein the Commission established a maximum base rate of $0.50 per Mcf for gas sold in interstate commerce which was produced from wells spudded on or after January 1, 1973. None of the gas that is the subject matter of this action would qualify for this FPC price if it had been sold in interstate commerce. On August 28, 1975, the Federal Power Commission issued FPC Opinion No. 742, effective August 28, 1975. Under this opinion the FPC established the maximum rate for sales made by small producers after August 28, 1975 at 130% of the applicable base ceiling rate established for large producers. The stated purpose of FPC Opinion No. 742 was to recognize the additional costs experienced by small producers and to encourage the drilling by them of exploratory wells to foster the development of new supplies of natural gas by small producers. None of the producers in this action could have qualified as small producers for purposes of FPC Opinion No. 742 had they been selling gas in interstate commerce.

30. On July 27, 1976, the Federal Power Commission issued FPC Opinion No. 770, effective as of July 27, 1976. On November 5, 1976, the FPC amended Opinion No. 770 issuing FPC Opinion No. 770–A, which opinion was retroactively effective as of July 27, 1976. In FPC Opinion No. 770–A the FPC continued the major vintage distinction between old and new gas and provided further vintaging distinctions within the new gas category. These vintaging distinctions were as follows:

A. Gas from wells commenced prior to January 1, 1973, was subject to a base price ceiling of 29½ cents per Mcf.

B. Gas which was not previously dedicated to interstate commerce from wells commenced prior to January 1, 1973, was subject to a base price ceiling of 52 cents per Mcf.

C. Gas from wells commenced after January 1, 1973, and before January 1, 1975, was subject to a base price ceiling of 93 cents per Mcf.

D. Gas from wells commenced on or after January 1, 1975, was subject to a base price ceiling of $1.42 subject to a one cent per quarter escalation.

31. On November 9, 1978, the President of the United States signed the Natural Gas Policy Act of 1978 (NGPA), which then became effective December 1, 1978, and which retained vintaging distinctions. The NGPA is designed to decontrol prices for certain categories of natural gas and are directed primarily at new natural gas wells. The Act does not generally deregulate prices of gas from existing wells.

32. Under Section 105 of the NGPA, for any intrastate contract existing on the date of enactment any gas sold after the enactment date is subject to a maximum lawful price equal to the lower of the contract price or the maximum lawful price as calculated for new natural gas under Section 102 of the NGPA. New natural gas will qualify for price deregulation on January 1, 1985. New natural gas prices increase monthly by reason of an inflation adjustment factor plus a real growth factor.

33. Early in December 1975 Amoco demanded payment from Northern of a price which would include the FPC 130 percent allowance to small producers. (Exhibit I–23). Amoco noted in Exhibit I–23 that if contract vintage were considered the price would be 24¢ or 35¢ per Mcf. Without the small producer allowance and without regard to contract vintage (the date of the Contract to sell natural gas) the FPC price would be 53¢ per Mcf, and the small producer price would be 53¢ times 1.3.

34. After FPC Opinion No. 770 was issued and became effective, representatives of Northern and Amoco met in Cheyenne, Wyoming on August 2, 1976 to discuss Amoco's plan to phase in the price increases to which Amoco claimed it was entitled under the terms of the supplemental agreements. Instead of demanding that Northern start immediately paying the amounts to which Amoco claimed entitlement under clause 6(b), Amoco agreed to phase in the price increase over a period of time. Thereafter Amoco sent a letter dated August 5, 1976, to Northern (Exhibit D). Amoco agreed to give Northern one working day's notice of the new price it would propose to collect and the date of collecting such new price in order that Northern could file an application with the Wyoming Public Service Commission for an increase in tariffs reflecting such increase. Also Amoco therein agreed to waive any claim for payment of any increased price under the contract prior to the date stated in the notice.

35. After FPC Opinion No. 770–A was issued and became effective, Amoco sent a letter to Northern dated December 8, 1976 (Exhibit E) which stated that Amoco elected pursuant to Article 6(b) of the contract to commence collecting prices less than the price resulting from Opinion 770 effective as of January 1, 1977. For gas delivered during the period commencing on January 1, 1977, and ending on June 30, 1977 Amoco was electing to assert collection of a price of $1.06 per Mcf and for gas delivered during the period commencing July 1, 1977 and ending June 30, 1978 Amoco was electing to assert collection of a price of $1.43 per Mcf. Commencing July 1, 1978 Amoco gave notice that it intended to collect the full price resulting from Opinion 770.

36. From the inception of the contract relationship between Northern and the three producers no payments were made directly to Phillips or Kerr–McGee by Northern. Amoco was authorized by Kerr–McGee and Phillips to receive and make settlement for payments of their share of Beaver Creek gas, and Amoco in turn distributed to Phillips and Kerr–McGee their respective shares thereof. (Exhibit A–1).

37. After FPC Order No. 435 became effective and as of January 1, 1972, Amoco calculated that the maximum price it could collect for Beaver Creek Field gas was 19.-162¢ per Mcf, including adjustment for inflation and tax reimbursement plus any increase in taxes above the calculated reimbursement. (Exhibit I–22).

38. Northern was faced with the alternative of making payment of the rates requested by or for the producers and obtaining a new tariff allowance from the Wyoming Public Service Commission to cover the increase or suffering a possible termination of the contract and losing its long term supply of natural gas under the default

provisions of the contracts. When given this choice, Northern elected to pay the demanded amounts until a settlement could be made or the question of price could be determined. Northern's election to pay the price demanded was based upon its inability to be certain whether or not FPC Opinion No. 770 and FPC Opinion No. 770-A activated said price escalation clause and its inability to withstand termination for non-payment. Additionally if Northern did not obtain an increased tariff from the Public Service Commission, it could not collect the increased price retroactively from its customers, although it could refund any excess payments if the higher prices were reduced by settlement or adjudication.

39. The prices demanded by and paid to the producers by Northern have had an inequitable result, causing rate payers buying gas at retail to be charged exorbitant prices for the natural gas involved in this case grossly beyond any reasonable expectation of Northern as one of the contracting parties.

40. At the times the parties executed the Supplemental Agreement FPC price controls were directed to holding down the price of natural gas on an area pricing basis, determined on the producers' costs plus a reasonable return on investment.

41. At the times the parties executed the Supplemental Agreement, Northern did not contemplate nor was it suggested by any other party that FPC pricing practices then existing and contemplated would materially or substantially change during the term of said contracts.

42. Each of the producers has claimed from the effective date for clause 6(b) that it was entitled thereby to receive the highest price for any gas sold in interstate commerce regardless of the kind of gas, the special circumstances of the sale, extraordinary values attributable thereto, not common or similar to the gas in question or any other circumstances.

43. It was beyond the contemplation of Northern at the time it executed the Supplemental Agreement that FPC Opinion No. 699-H, FPC Opinion No. 742, FPC Opinion No. 770, FPC Opinion No. 770-A and the Natural Gas Policy Act of 1978 would be claimed to activate Article 6(b) so that Northern would be required to pay rates for Beaver Creek gas which would be greatly different or exorbitant in comparison to rates incorporated in the contract between the parties. (Substituted Exhibit 11 and Exhibit G). It is doubtful that the producers contemplated such sharp increases for small producers and new natural gas but their intention was to claim the highest price which might be received by any producer in the Wyoming area for any gas sold in interstate commerce. (Testimony of Arles J. Barrett, and Exhibits I–11, I–13, I–21, as well as the demands for the receipt of payment including small producers' allowance and other escalations reflected on defendants' Exhibit 11).

44. The effect of the supplemental contracts with clause 6(b) contained therein was to provide by an indefinite price escalator clause the benefit of extraordinary price increases authorized by the Federal Power Commission for producers and gas supplies meeting the conditions precedent to receiving such a high price while such conditions could not be met by the producers herein nor by Beaver Creek gas supplies. The effect of clause 6(b) was to obtain the unlimited high price allowed for gas sold in interstate commerce without regard to the interest of Northern and without regard to the interest of the public retail consumers who would be required to pay retail rates sufficient to cover such escalated prices.

45. Without clause 6(b) in the Supplement each producer still has the right to receive increased contract price adjustments for inflation and the benefits of the favored nations clause 6(a) if Northern should pay a higher price to a third party for gas. There is no evidence that Northern has paid a price to a third party supplier of gas in excess of the specific prices otherwise provided in the Supplement excluding the application of clause 6(b). Considering these circumstances, the contract is one that could result and did result in extreme hardship to the public.

46. Section 105 of the Natural Gas Policy Act of 1978 imposes a ceiling price on Beaver Creek gas commencing December 1, 1978. That ceiling is the lesser of the NGPA Section 102 price applicable to "new" natural gas, or the price under the terms of the contract. The "new" natural gas price adopted by reference therein increases monthly by virtue of an inflation index plus a factor designed to escalate the "new" gas price to the heating value equivalency of fuel oil by January 1, 1985. The "new" gas base price plus allowable tax reimbursement, adjusted to reflect the BTU of Beaver Creek gas, was approximately $2.80 per Mcf at the time of trial. On January 1, 1985 "new" gas will be deregulated. Intrastate gas such as Beaver Creek will also be deregulated on January 1, 1985, unless its price is then being fixed under an indefinite price escalator clause such as clause 6(b). The producers have taken the position that they are entitled to collect the highest price legally permissible. Although Beaver Creek gas is now subject to a ceiling price, there is no assurance it will continue to be so restricted.

47. The cost of Beaver Creek natural gas to consumers served by Northern has increased from a price of approximately 28¢ per Mcf in December of 1975 to a price of approximately $2.80 per Mcf in April, 1980, an increase in slightly over four years of 10 times the price specifically bargained for under Articles 5 and 7 of the contracts. For the consumer a monthly gas bill of $30 has been increased to approximately $250 and is still increasing under clause 6(b) as claimed by the producers.

48. Out of the specific fee or transportation allowance payable to Northern for gas delivered to Casper refinery, Salt Creek and Winkleman Dome, Northern must bear the cost of line loss which averages two percent of the gross quantities transported. If clause 6(b) is enforced, the cost to Northern of the two percent line loss would exhaust the entire transportation allowance of 5¢ per Mcf for transportation of the gas delivered from Beaver Creek to Amoco's Standard Refinery at Casper, Wyoming and such transportation would be provided by Northern at a loss.

49. The evidence in the record does not support the interpretation of clause 6(b) to include a right to reimbursement of ad valorem taxes assessed against the producers. Article 16 of the contracts is not specifically changed or amended by clause 6(b) nor are any adjustments to price included therein. The substituted Exhibit 11 of the producers reflects producers' claims of a right to recover from Northern the amount of ad valorem taxes which were reimbursed to third–party sellers under FPC provisions applicable to the interstate sale even though higher than ad valorem taxes on Beaver Creek gas. The Court finds no factual basis to permit the producers to recover ad valorem taxes paid by a third party on production not related to Beaver Creek.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter in this action pursuant to 28 U.S.C. § 1332.

2. Once the Public Service Commission has accepted for filing a gas purchase contract, the cost of gas thereunder is recoverable as a matter of law through rates sufficient to pay such costs plus the cost of the utility service plus a reasonable rate on investment. Title 37, W.S.1977. *Bluefield Waterworks & Improvement Co. v. Public Service Commission of West Virginia*, 262 U.S. 679, 692–693, 43 S.Ct. 675, 678–679, 67 L.Ed. 1176 (1923); *FPC v. Hope Natural Gas*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944).

3. This case involves a substantial public interest, it appearing from the record that approximately 85% of the total gas acquired by Northern for resale to the public is limited to the gas it receives under the 1957 Gas Sales Contract as supplemented and that all such gas is sold principally to residential consumers in the communities of Lander, Riverton and Casper and intervening areas, and a part of such gas is sold to Northern Gas Company and results in increased prices to users in its service area which includes Rawlins, Laramie and intervening communities.

4. The increase in price occurring since clause 6(b) became effective from approximately $0.28 per Mcf to the current $2.80 per Mcf has the effect of increasing the residential consumers' monthly gas bill from an assumed $30 per month to a figure of approximately $250 per month. The cost of converting a natural gas heating system to an alternate fuel in a typical home in the areas served would require a capitalized expenditure of $2,500 or more.

5. The public interest is further demonstrated by the fact that all the parties in this case knew that the gas sold and committed under the Supplement (except for the portion purchased at Northern's cost by Amoco) would be resold to consumers who would be required to pay a price for such gas in excess of the price received by the producers from Northern as a regulated public utility.

6. Arles H. Barrett who negotiated the Supplement for Amoco testified that clause 6(b) was a new and unique clause and not one used in any other contract of which he had knowledge. It was designed and written (except for its effective date) by legal counsel on the staff of Amoco in Denver and was intended to provide that Amoco would be entitled to the highest possible price for the Beaver Creek gas based upon the highest price paid for any gas produced in Wyoming (except two counties) and sold in interstate commerce without regard to the fact that such highest price interstate gas might be priced as the result of higher BTU's (heating value), lower pressure base, higher taxes included in the price, and also without regard to extraordinary FPC price allowances contrary to the national public policy except for special conditions not common to Beaver Creek gas nor to the producers.

7. The intention and demands of Amoco, Phillips and Kerr–McGee for prices exacted from Northern Utilities, Inc. were designed to and will result in an inequitable, illegal and oppressive result, causing rate payers in the areas served to be charged exorbitant prices for the natural gas involved in this case. Clause 6(b), as intended by the producers and as now interpreted by them, was unconscionable and against public policy in its design at its inception and since then their intentions have been corroborated by the results.

8. The public interest is further demonstrated by the fact that Amoco recognized the steepening spiral of prices and hardships resulting to public consumers by suggesting a phase–in price. The evidence pertaining thereto shows that the purpose of the phase–in was to assist Amoco in its public relations and not to serve the interests of the public consumer. Amoco in argument before this Court has reverted to its contention that it is entitled to the highest price possible under clause 6(b) in spite of Amoco's voluntary election to phase in such highest prices over a period of 18 months.

9. The central issue in this case is whether under the powers of equity and the provisions of § 34–21–219 W.S.1977, this Court should strike down clause 6(b) as void against public policy and unconscionable at the time the parties entered into the contract and enforce the remainder of the contract with clause 6(b) omitted therefrom.

■ 10. Ordinarily it is desirable that parties be protected in their right to make and enforce agreements between themselves, but this right is limited by the rule that an agreement must not be contrary to public policy. *Adkins v. Children's Hospital*, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923).

■ 11. The Courts will deny enforceability of a contract provision that clearly contravenes the public right or the public welfare or gravely violates paramount requirements of public interest. *Chicago and North Western Railway Co. v. Rissler*, 184 F.Supp. 98 (Wyo.1960), *Northwest Airlines, Inc. v. Alaska Airlines, Inc.*, 351 F.2d 252 (9th Cir. 1965).

■ 12. It is a fundamental doctrine that the extent to which a court of equity may grant or withhold its aid and the manner of molding its remedies is dictated by the public interests involved. *United States v. Morgan*, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939).

13. The courts of equity will refuse to decree specific performance of a contract provision where the result would be unconscionable or unjust. *U.S. v. Georgia Pacific Co.*, 421 F.2d 92 (9th Cir. 1970), *Union Pacific Railroad Co. v. Chicago R.I. & P.R. Co.*, 163 U.S. 564, 16 S.Ct. 1178, 41 L.Ed. 265 (1896), *Campbell Soup Co. v. Wentz*, 172 F.2d 80 (3rd Cir. 1948). Courts of equity will not assist a party seeking to enforce a hard bargain. *Keller v. California Liquid Gas Corp.*, 363 F.Supp. 123 (Wyo. 1973).

14. A court should not hesitate to refrain from enforcing a contract provision when there is some overriding reason for public concern and the contract provision in some way causes real harm to the public. *Hudson Waterways Corp. v. Coastal Marine Service, Inc.*, 436 F.Supp. 597 (E.D.Tex. 1977).

15. The United States Supreme Court has indicated that indefinite escalator clauses by their design and function alone may be "incompatible with the public interest." *In re Permian Basin Area Rate Cases*, supra, at pg. 783, 88 S.Ct. at pg. 1368, 20 L.Ed.2d 312 (1968).

16. This Court finds as a matter of law that clause 6(b) as it is interpreted by the producers, viewed in the light of the producers' intentions at the time each executed the Supplement and evidenced by their actions in demanding the highest price for any gas sold in interstate commerce without regard to substantial differences in such gas and the conditions precedent to such high prices being authorized, is a clause that is void as against public policy and unconscionable under § 34–21–219 W.S. 1977. Throughout the proceedings the producers have demanded that they be paid FPC prices designed and justified only for small producers when none of the producers could qualify as a small producer under the regulations which permitted such bonus price to be paid. This is contrary to the policy of the United States, whose special allowances were specifically withheld from gas sold in interstate commerce but equivalent in all other respects to the gas involved in this case.

17. The case of *Bradford v. Plains Cotton Cooperative Assn.*, 539 F.2d 1249 (10th Cir. 1976) presented a factual situation unlike the facts in the instant case. In the *Bradford* case, farmers who raised cotton had made forward contracts for the sale of cotton to a cooperative. The contracts for the sale of cotton were made for a specific price pursuant to a schedule for cotton to be delivered within a specific time, namely, the growing season. The cotton buyer could and did protect itself by promptly selling cotton or cotton futures to avoid risk. The cotton contracts ran for a period of six months. Unlike the clause in *Bradford*, clause 6(b) in the instant case operates for a period of twelve years. Northern cannot sell futures in natural gas nor sell surplus gas from Beaver Creek, the only market being an interstate market, and the contract itself forbids a sale of Beaver Creek gas in the interstate market. In the *Bradford* case the parties could not foresee and did not contemplate that the government might lift the acreage restriction on cotton planting. In the instant case the producers are substantial producers in the nation-wide natural gas producing industry, and they were aware of the then current proposals to change ceiling prices and methods concerning them as stated in the notices of the FPC in June and July 1970 (Exhibits J and K). Phillips and Kerr–McGee had much later knowledge of the prospects for drastic increases since they signed the Supplements in 1973. In the instant case there is no contention by the producers that the prices under Article 5, adjusted by Article 7, were unfair. But since the provisions of clause 6(b), as intended by the producers, would remove all price restraints from the contract and fix a then indefinite price that would result in windfalls to the producers and would result in unjustly burdensome and harsh results to the consumers, clause 6(b) was unconscionable at the time of its making. In the *Bradford* case the cotton buyer experienced a gain in income under the cotton contracts of less than nine-tenths of one percent. In the case at bar

the producers were profitably selling natural gas at $0.28 per Mcf, and now demand ten times that figure, an increase of 900% or more. Finally, the sale of cotton in the *Bradford* case did not involve a public interest; while the case at bar involves a substantial public interest. This Court is persuaded that the *Bradford* case is distinguishable from the case at bar on its facts.

18. The case of *Amoco Production Co. v. Stauffer Chemical Company of Wyoming*, 612 P.2d 463 (1980) presented a factual situation unlike the one presently before us. No argument was made in *Stauffer* that the particular clause involved in that case was unconscionable or against the public interest. The fact that the Wyoming Supreme Court upheld the favored nations clause found in *Stauffer* is of little consequence in this situation. The Court has the ability to pass directly on the unconscionability of each individual contract or particular clause therein in light of the general commercial background and needs of each case and to limit unconscionable contract provisions so as to avoid unconscionable results. § 34–21–219 W.S. 1977 and official comments to the Uniform Commercial Code.

19. Favored nations clauses "naturally grant an advantage to the seller. As such, they have generally been construed in favor of the buyer and against the seller. Neither the courts, nor regulatory agencies dealing with such clauses, have looked upon them with favor .... There need be no economic or other substantial justification for the increase." *Superior Oil Company v. Western Slope Gas Co.*, 604 F.2d 1281, concurring Opinion at pg. 1295 (10th Cir. 1979).

20. The indefinite escalation clause in this instance causes price increases to occur without reference to the economics and circumstances of the particular operation. *Permian Basin Area Rate Cases*, supra.

21. As such, paragraph 6(b) causes windfall profits and substantially increases the cost to consumers for a commodity without which they may well not be able to live. The impact of such escalations could well be devastating on the general public in the communities served by Northern. *Superior Oil Company v. Western Slope Gas Company*, supra, concurring opinion at pg. 1296 (10th Cir. 1979).

■ 22. When a provision of a contract is void as against public policy or unconscionable, the Court may enforce the remainder of the contract without the undesired clause. *Driessen v. Freborg*, 431 F.Supp. 1191 (N.D.1977), *Union Tank Car Co. v. Lindsay Soft Water Corp. of Omaha, Inc.*, 257 F.Supp. 510 (D.C.Neb.1966), § 34–21–219 W.S. 1977.

23. With respect to clause 6(a) in the Supplement, there is no contention that any price has been activated thereby nor any issue of fact existing therewith. Northern moved to dismiss any claim concerning clause 6(a) without prejudice. The Court concludes that clause 6(a) should remain in the contract in the event that it may activate higher prices in the future, subject at that time to a determination of the question then presented whether it is valid and enforceable under such facts and circumstances as the evidence at that time may disclose.

24. The payments demanded of and paid by Northern Utilities, Inc. to Amoco and in turn to Phillips and Kerr–McGee under said clause 6(b) were illegal, and the amounts so paid in excess of the price determined under the other provisions of the 1957 contract as supplemented should be refunded to Northern Utilities, Inc. who, in turn, has agreed to make refunds to its rate payers in accordance with orders of this Court and the Public Service Commission of Wyoming.

25. Judgment shall be entered in conformance with these Findings of Fact and Conclusions of Law.